**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| TRACEY CARTER and BONNY DAVIS, as the representatives of a class of similarly situated persons, and on behalf of the Sentara 403(b) Savings Plan,<br><br>          Plaintiffs,<br><br>v.<br><br>SENTARA HEALTHCARE FIDUCIARY COMMITTEE AND SENTARA HEALTH,<br><br>          Defendants. | Case No. 2:25-cv-00016<br><br><br>**COMPLAINT**<br><br>**CLASS ACTION** |

## NATURE OF THE ACTION

1.      Plaintiffs Tracey 305 and Bonny Davis, as the representatives of the Class (as defined herein), and on behalf of the Sentara 403(b) Savings Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), against the Sentara Healthcare Fiduciary Committee (the "Committee") and Sentara Health *d/b/a* Sentara Healthcare ("Sentara" and collectively with the Committee "Defendants").

2.      Defendants breached their fiduciary duties under ERISA, 29 U.S.C. §§ 1104(a)(1) and 1105(a)(2) by failing to monitor the Plan's chronically underperforming stable value investment option.

3.      Defendants' failure to remove and replace the Plan's underperforming stable value investment option resulted in substantial losses to the Plan recoverable from Defendants under ERISA, 29 U.S.C. § 1109.

4.      Plaintiffs bring this action on behalf of the Class and the Plan pursuant to 29 U.S.C. § 1132 to recover the losses resulting from Defendants' ERISA violations and to compel Defendants to implement prudent processes to prevent further losses to the Plan.

## SUMMARY OF CLAIM

5.      Employers that manage workplace retirement savings plans governed by ERISA act in a fiduciary capacity. 29 U.S.C. § 1102(a)(1). Such fiduciaries must act with the "care, skill, prudence, and diligence" appropriate to this task. 29 U.S.C. § 1104(a)(1)(B). The standard of care, skill, prudence, and diligence required to manage an ERISA plan is often described as "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982).

6.      Defendants failed to act with the care, skill, prudence, and diligence required of ERISA fiduciaries in failing to monitor the Plan's fixed income investment option, the

2

Guaranteed Interest Balance Contract ("GIBC"), an insurance product furnished by Principal Life Insurance Company ("Principal").

7.     This type of investment option is referred to in the industry as a "stable value" option. Stable value products are specialty insurance products found only in retirement plans. They are not structured as mutual funds, but as general account fixed annuity group insurance contracts. They are not only structured differently than mutual funds, but the relevant marketplace is different, as are the tools available to monitor and compare the product's performance. For a Plan with substantial stable value assets such as the Plan, monitoring stable value products requires evaluating the terms and conditions of the stable value contract, researching the relevant market, and testing the market by, among other things, issuing requests for information and proposals. To implement a prudent process, a plan must, in most cases, seek the assistance of an advisor or consultant with stable value expertise.

8.     The GIBC is an off-the-shelf product offered by Principal to retirement plans that lack the bargaining power to negotiate and select competitive stable value products that offer higher returns without additional risk. These superior stable value products—including general account, pooled separate account, and custom products—are available only to plans that, like the Sentara Plan, have substantial assets to invest in the plan's stable value option. The vast majority of these large, sophisticated plans take advantage of these superior offerings in the marketplace.

9.     At year-end 2023, the Plan had $136 million invested in the GIBC, giving it substantial bargaining power in the stable value marketplace. And yet, the Plan has retained the off-the-shelf GIBC product from Principal, which has uncompetitive returns that have lagged both the rate of inflation and competitor products by between 1% and 2% per year since 2019.

10.     Other plans with stable value bargaining power have fared far better by seeking and utilizing superior stable value products. The participants in these plans enjoy substantially higher crediting rates (which is how stable value product "investment returns" are measured) for an equivalent level of risk and comparable liquidity and withdrawal restrictions.

11.     Defendants had (and continue to have) a fiduciary obligation to seek and utilize superior stable value products available by soliciting proposals from competing stable value providers. Defendants have never done this. Had Defendants done so, they would have been able to secure a stable value product with higher crediting rates for an equivalent level of risk.

12.     The Committee's failure to monitor the GIBC stable value option is a violation of its fiduciary duties under ERISA, 29 U.S.C. 1104(a)(1). Had the Committee prudently monitored the stable value marketplace and sought competing proposals, it would have discovered that the GIBC's crediting rates were far below market and replaced it with a superior option. Instead, the Committee sat idly by as Plan participants lost millions of dollars every year due to the GIBC's below-market crediting rates.

13.     Sentara's failure to monitor the Committee is a violation of its independent fiduciary duties under ERISA, 29 U.S.C. §§ 1104(a)(1) and 1105(a)(2). As the ultimate governance authority for the Plan and the person that appoints members of the Committee, Sentara had a duty to monitor the Committee to ensure that it performed its fiduciary role competently and consistent with ERISA's stringent requirements. After the Committee persisted in failing to prudently monitor the Plan's stable value option, Sentara had a duty to intercede but failed to do so.

14.     Defendants' persistent failure to prudently monitor the Plan's stable value product has caused the Plan to suffer more than $11.4 million in losses throughout the relevant period.[1] These losses continue to accrue as a result of Defendants' ongoing fiduciary failures.

15.     Plaintiffs seek recovery on behalf of the Plan of these losses; recovery of such additional losses as may accrue and compound through trial; and injunctive relief sufficient to correct the deficiencies in Defendants' fiduciary processes and protect the interests of participants in their retirement savings going forward.

## JURISDICTION AND VENUE

16.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy violations of ERISA, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §1132(e)(1) because this case presents a federal question.

18.     Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district where the Plan is administered, where the breaches of fiduciary duty occurred, and where Defendants may be found.

---

[1] ERISA claims are subject to a six-year statute of repose. 29 U.S.C. § 1113(1). A failure to monitor investments during the six-year period is actionable notwithstanding the date of initial investment. *Tibble v. Edison*, 575 U.S. 523, 528 (2015). References to the "statutory period" mean the period that begins on the date that is six years prior to the date that this action was filed.

## THE PLAN AND PARTIES

### THE PLAN

19.     The Plan is a "defined contribution plan" as defined by ERISA, 29 U.S.C. § 1002(34). The purpose of the Plan is to provide retirement benefits to eligible Sentara employees through the deferral of pre-tax wages and the investment of the resulting contributions in a menu of investment options selected and ostensibly monitored by the Committee.

20.     The Plan is tax-qualified under 26 U.S.C. § 403(b) and commonly referred to as a "403(b) plan." Plans that operate under section 403(b)'s beneficial tax scheme are administered by certain qualifying non-profits, including universities and hospitals such as Sentara.

21.     In defined contribution plans, each employee has an individual account. The benefits ultimately paid to the employee are a function of the amount the employee and employer contribute to the plan and the performance of the investments.

22.     Participants are limited to the investments selected by the plan's fiduciaries and cannot choose alternative investments outside of the plan's investment menu, even when the plan's investments are inferior and superior alternatives may be available in the marketplace.

23.     At the start of 2019, the Plan had around $1.87 billion in assets, of which $103 million was invested in the GIBC, and had 36,025 participants with account balances. At year-end 2023, the Plan had $3.3 billion in assets, of which $136 million was invested in the GIBC, and had 39,911 participants with account balances.

### PLAINTIFFS

24.     Plaintiff Tracy Carter currently has an account balance in the Plan and has maintained an account balance in the Plan throughout the statutory period. Her Plan account has during the statutory period been invested in the GIBC, and her account balance and ultimate distribution from the Plan would be higher had Defendants prudently monitored and investigated

6

the Plan's stable value opportunities and replaced the GIBC with a prudent alternative available to the Plan.

25.     Plaintiff Bonny Davis currently has an account balance in the Plan and has maintained an account balance in the Plan throughout the statutory period. Plaintiff Davis' account is managed by a third-party investment service offered by the Plan, which is based on a computerized asset allocation model. Currently, if the model determines to invest Plaintiff Davis' account in stable value, the GIBC is the only stable value product that the model may invest in because the GIBC is the only stable value product in the Plan open to new contributions and transfers. Plaintiff Davis' account is subject to lost earnings relative to what her account value and ultimate distribution amount would be had Defendants prudently monitored and investigated the Plan's stable value opportunities and replaced the GIBC with a prudent alternative available to the Plan.

## DEFENDANTS

26.     According to the Plan's Department of Labor (DOL) Form 5500 filings, the Committee "determines the appropriateness of the Plan's investment offerings, and monitors investment performance." Such discretion with respect to investment monitoring and selection constitutes "authority or control respecting management or disposition" of the Plan's assets, which makes the Committee a "fiduciary" of the Plan as defined by ERISA, 29 U.S.C. § 1002(21)(A)(i). On information and belief, the Committee is composed of senior officers or directors of Sentara.

27.     Sentara is designated on the Plan's DOL Form 5500 filings as the "administrator" of the Plan within the meaning of 29 U.S.C. § 1002(16)(A). In this capacity, Sentara exercises ultimate discretionary authority and control with respect to the management and administration

of the Plan, including the appointment of the Committee. Thus, Sentara is a fiduciary of the Plan as defined by 29 U.S.C. § 1002(21)(A)(i) and (iii).

**ERISA'S FIDUCIARY DUTIES**

28.     ERISA imposes strict fiduciary duties upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan …
>
>> (A)     for the exclusive purpose of
>>
>>> (i)     providing benefits to participants and their beneficiaries; and
>>>
>>> (ii)     defraying reasonable expenses of administering the plan;
>>
>> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims[.]

These duties are "the highest known to the law." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014).

29.     ERISA fiduciary duties build on the common law of trusts. "Rather than explicitly enumerating *all* of the … duties of fiduciaries [in ERISA], Congress invoked the common law of trusts to define the general scope of their … responsibility." *Chesemore v. Fenkell*, 829 F.3d 803, 811 (7th Cir. 2016) (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985)); *see also Tatum*, 761 F.3d at 357.

30.     "If there is…a 'hallmark' of a fiduciary activity identified in the statute, it is prudence." *Sweda v. Univ. of Penn.*, 923 F. 3d 320, 333 (3d Cir. 2019).  This is not a lay person

standard, but instead "requires expertise in a variety of areas[.]" Dep't of Labor, *Meeting Your Fiduciary Responsibilities* (Sept. 2017).[2]

31.     Fiduciaries have a "duty to exercise prudence in selecting investments" as well as a "continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 575 U.S. at 528.

32.     The prudent investor rule's emphasis on monitoring recognizes that an investor's buying power, as well as the marketplace of available alternatives, will vary and change over time. *Id.* at 528 (finding that the "availability and continuing emergence of modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs" requires a strong duty to monitor); *see also Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (holding on remand that a fiduciary "cannot ignore the power the trust wields to obtain favorable investment products").

33.     In determining whether an ERISA fiduciary breached its duty of prudence, courts focus on process. *Tatum*, 761 F.3d at 356–58 (holding that prudence turns on whether the fiduciary "employed the appropriate methods to investigate the merits" and "engaged in a reasoned decision-making process").

34.     Each dollar wasted is one less dollar in participants' accounts. These lost returns compound over time. The United States Department of Labor estimates that over the course of a career, earning 1% less in net returns per year will reduce a participant's savings at retirement by 28%.[3]

---

[2] *Available at* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.
[3] *See* Department of Labor, *A Look at 401(k) Plan Fees*, at 2 (Sept. 2019), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

## FACTUAL ALLEGATIONS
## CONCERNING DEFENDANTS' BREACHES OF FIDUCIARY DUTY

### PRODUCT AND PROCESS

35.     The Plan had both the bargaining power and the means to implement a prudent process to monitor the GIBC and, upon discovering that the GIBC's returns were below-market, to replace the GIBC with a superior stable value product.

36.     Plans with smaller stable value investments cannot afford to hire professional investment advisors to investigate options in the marketplace. An organization with only a few hundred thousand dollars invested in stable value could spend 10%–25% of participants' investment value on the cost of a product search. At this level, the potential gains do not justify the cost. The median plan that uses the GIBC has $4 million in stable value assets. For these plans, the expense associated with a full product search would be around 1% of participants' stable value investments, which may be difficult for a fiduciary to justify. Accordingly, it is common for smaller plans to be offered only a single off-the-shelf stable value option by the plan's recordkeeper on a take-it-or-leave it basis.

37.     The situation for plans such as the Plan with $50 million or more held in stable value is markedly different. A thorough product search aided by a competent advisor costs only a few basis points on stable value assets (and less than a basis point if assessed across the entire plan).[4] The cost per dollar of testing the market is readily justified by the potential gains. Here, the additional interest earned in the first year from a prudent stable value product would have likely been 25 to 100 times more than the total cost of conducting a prudent product search.

38.     As the cost of a product search per dollar decreases, the size of the opportunity for gain increases. Stable value product providers generate revenue as a percentage of the assets

---

[4] One basis point is equal to 0.01%.

invested. Product providers achieve substantial economies of scale by capturing $50 million or more from a single customer and are generally willing to pass some of those benefits back to customers in the form of higher crediting rates in order to win the business. A nine-figure stable value investment such as the Plan's investment not only makes product due diligence cost effective, but the plan's bargaining position to obtain a higher crediting rate is stronger as well.

39.     Accordingly, it is standard for plans with substantial participant investments in stable value to monitor opportunities in the marketplace on an ongoing basis and periodically solicit competitive bids. This often requires the aid of professional advisors, as the members of a plan's fiduciary committee typically do not independently possess sufficient expertise to competently monitor and evaluate the stable value marketplace. Further, the plan's fiduciaries cannot rely upon advice from the plan's recordkeeper, who may have financial incentives to continue using the current product.

40.     This is due to the unique character of stable value products. Mutual funds comprise substantially all non-stable value investments in 403(b) plans, but stable value is a distinct investment vehicle and assets class compared to mutual funds. For fiduciaries generally accustomed to mutual funds, stable value products are not intuitive and require their own framework for prudent investigation and monitoring.

41.     Mutual funds are regulated under federal securities laws and must make robust public disclosures of fees, assets, performance, market benchmarks, and fund operations. Mutual funds are also structured intuitively to pass asset returns directly to investors, net of disclosed fees. A fiduciary can readily compare a mutual fund's performance against the fund's self-selected market benchmark to monitor whether it is preforming in line with how it is supposed to perform. A fiduciary can likewise compare a mutual fund's performance and fees to similar

mutual funds with the same investment objective. Low-cost subscription databases are readily available to fiduciaries that compile the entire universe of mutual fund performance, fee, and portfolio data and provide support tools designed to allow investors to quickly and effectively research and monitor mutual funds.

42.     A stable value product is similar to a money market fund in that it provides principal protection and liquidity, but provides higher returns on par with bond funds. But the similarities with mutual funds end there. Principal protection for stable value products is provided by a guarantee that the stable value product will transact at "book value". In other words, a participant that deposits a dollar in the stable value product may withdraw the dollar plus interest credited to the participants' account (this interest is the "crediting rate"). The book value guarantee stabilizes returns. The value of the participants' interest does not rise and fall with changes in interest rates, as in the case of a bond fund. In many cases, the stable value contract guarantees a minimum rate of return.

43.     However, these benefits—capital preservation and stable, positive returns for participants—come at a cost. Whereas a plan may replace a mutual fund on 60 days' notice or less, stable value contracts often impose restrictions on the replacement of the product. Such restrictions may include a fixed surrender charge, a possible payout reduction based on market conditions, or a payout delay of up to a year or more, and restrictions on transfers to competing investment options.

44.     There are two main types of stable value products found in 403(b) plans: general account products and separate account products.[5] In the case of separate account products,

---

[5] There are also "synthetic" stable value funds – structured as collective investment trusts (CIT) with bond portfolios supported by multiple insurance wrappers – that dominate the stable value

deposits are placed in an insurance company separate account, where they are insulated from the claims of the insurance company's general creditors. In the case of general account stable value funds, such as the GIBC, the deposits are held unrestricted in the general account of the insurance carrier, where they are subject to the claims of the insurance company's general creditors.

45.     The crediting rates of general account stable value products are not typically bound to the performance of underlying assets in the provider's general account. Instead, the crediting rates are set by the product provider in its discretion. Many product providers, including Principal, do not disclose how much investment revenue they earn on underlying assets compared to the crediting rate (called the "spread").

46.     Stable value products can also be divided into off-the-shelf products and custom products. An off-the-shelf product comprises the standard terms sold by a provider to a large number of plans. The rate-setting economics for an off-the-shelf product are based on the provider's generalized assumptions about asset levels, withdrawal rates, distribution and servicing costs, and competition in the marketplace for its standard customer. In a custom product, a plan with substantial buying power due to its assets invested in stable value is priced on its own terms, which may yield a higher crediting rate.

47.     All of these features make general account stable value products less transparent than mutual funds. There is no objective market benchmark communicated by the stable value product provider to measure the product's performance over time. There are no disclosed fees. The provider's compensation (the "spread") and the detailed formula used to determine the

---

market for large 401(k) plans. As a matter of historical accident in the drafting of the tax code, CITs are not qualified investments for 403(b) plans.

crediting rate are typically not disclosed. Many general account products, including the GIBC, change crediting rates at least annually but do not calculate 5- and 10-year average annual returns to assist customers in monitoring and evaluating performance over time. There are no subscription databases that have reliable and up to date information regarding current general account stable value product terms and historical performance.

48.    The critical information that a 403(b) plan fiduciary with a substantial investment in a general account stable product must monitor includes the following:

- the current crediting rate and contractual minimum crediting rate for their product;

- the average earnings history of their product over standard time intervals, including the 5-year average;

- the rates offered by competing products to similar plans, including current, minimum, and long-term average rates;

- limitations on transferring the investment to a new product, including any variable factors may affect their plan's opportunity to exit their contract at book value;

- additional factors that determine whether a product's level of risk is appropriate, including the credit quality of the product provider.

49.    There are industry standard fiduciary processes that fiduciaries must implement to satisfy their duty to investigate and monitor this information. A fiduciary will need to assess its members' stable value expertise, or lack thereof, and engage a competent advisor to fill the gaps. It is standard for fiduciaries with several billion dollars to retain advisors with expertise across asset classes and product types to provide ongoing consulting services. Such services typically consist of quarterly investment analyses and reporting and additional project work as needed to further investigate a product or service opportunity.

50.     Standard quarterly investment monitoring should include a review of publicly available information regarding competitor products. While competitive information is more limited for general account stable value products than it is for mutual funds, the leading provider of general account products to 403(b) plans, TIAA, publishes its current rates as well as the 5- and 10-year return averages for its model customer. Prudent monitoring of a general account stable value product must therefore include, at minimum, tracking TIAA's publicly disclosed rates and long-term averages.

51.     A fiduciary should also periodically engage in a process known as "Request for Information" (RFI). An RFI goes beyond publicly available information and asks product providers to submit an overview of their products and terms. The marketplace for general account products in 403(b) plans is competitive and product providers regularly respond to RFIs in a as little as a few days. For general account stable value products, it is important for fiduciaries to conduct an RFI at least every few years in order to monitor the marketplace.

52.     Following an RFI, a fiduciary should then perform a "Request for Proposals" (RFP). An RFP goes beyond the product overview solicited via an RFI and allows the plan fiduciary to ask specific questions and request specific documents to further vet available products. An RFP process typically includes a meeting or series of meetings with prospective providers to allow the providers to develop their best offers and to allow the plan fiduciary and its advisor to ensure that they understand each option. The RFP process provides an important opportunity for the plan fiduciary to negotiate with prospective providers and select the product that best serves the need of participants.

**LACK OF CARE AND LOST OPPORTUNITY**

53.     Despite its nearly $150 million invested in stable value, the Plan has remained invested in the same inferior GIBC stable value product since 1999. During that time, participants have contributed substantial retirement savings to stable value, increasing the Plan's investment in the GIBC tenfold from its initial deposit of $15 million in 1999.

54.     As the size of its stable value investment grew, the Plan had sufficient bargaining power and resources to monitor the GIBC and, upon identifying its deficiencies, to access a competitively priced replacement product available in the marketplace for similarly sized plans. But despite having the resources and bargaining power to access competitive stable value products, the Plan has retained the same underperforming GIBC product.

55.     Had Defendants prudently monitored the GIBC and the stable value marketplace, the GIBC's deficiencies would have been readily apparent by the end of 2018. Over the five-year period from 2014 to 2018, the GIBC's average annual crediting rate was 1.49%. The comparable version of TIAA's general account stable value product, the TIAA RC Plus, paid its investor plans 3.49% per year during the same period—more than double the earnings of the GIBC. This alarming earnings deficit relative to the leading provider should have put Defendant Committee on notice that it needed to put the Plan's decades-old stable value contract out for bid.

56.     Defendants' lack of care in retaining the GIBC during the statutory period is a stark departure from the actions of fiduciaries of similar plans. Among the hundreds of thousands of ERISA defined contribution plans in the United States, the Plan holds the second largest investment in the GIBC of all plans. The median investment held by an ERISA-governed defined contribution plan in the GIBC is around $4 million.

57.     The Plan's peers with more than $50 million in stable value investments have nearly unanimously invested in other general account stable value products with higher crediting rates. As shown below, in each year since 2019, the Plan has significantly underperformed the crediting rates earned by peer plans. The Plan's investment in the GIBC also continued to underperform TIAA's comparable product, the RC Plus.

|  | 2019 | 2020 | 2021 | 2022 | 2023 | 5-Year Avg. |
|---|---|---|---|---|---|---|
| Peer Group Weighted Average[6] | 3.82% | 3.68% | 3.25% | 3.74% | 4.26% | 3.75% |
| TIAA RC Plus | 3.26% | 3.25% | 2.80% | 3.42% | 4.05% | 3.36% |
| Plan's GIBC | 1.96% | 1.93% | 1.65% | 1.49% | 2.97% | 2.00% |

58.     Not only has the Plan's GIBC consistently and substantially underperformed the average rate paid by stable value products in peer plans, the Plan sits near the bottom of the range. As shown below, the rates paid by the GIBC averaged nearly 2 standard deviations below the average rates paid to peer plans between 2019 and 2023. In other words, the Plan's alarming earnings deficit relative to the weighted average rate paid in the relevant market is not the result of a few large plans having unusually high rates, with the rest of the market closely clustered around the Plan's rates. Rather, the distribution of rates among peers on the whole is relatively compact, and the Plan falls far outside the normal range.

---

[6] The Peer Group Weighted Average is the asset-weighted average rate paid by general account stable value investments of $50 million or more held for the entire year by plans in the peer group. The peer group is comprised of all ERISA-governed defined contribution plans that (1) follow a January 1 to December 31 fiscal year, (2) report "interest credited" with respect to general account contracts on Schedule A to DOL/IRS Form 5500, and (3) had more than 10,000 participants with account balances and more than $1.7 billion in total assets as of year-end 2022 (*i.e.*, within $1 billion of the plan's $2.7 billion at that time).

|  | 2019 | 2020 | 2021 | 2022 | 2023 | 5-Year Avg. |
|---|---|---|---|---|---|---|
| Standard Deviation from Average Rate in Peer Group[7] | 0.64% | 0.70% | 0.77% | 0.91% | 1.01% | 0.80% |
| Plan's GIBC - Deficit Compared to Average Rate in Peer Group | -1.57% | -1.47% | -1.36% | -2.02% | -0.94% | -1.47% |
| Plan's GIBC - Number of Standard Deviations Below Average Rate in Peer Group | 2.46 | 2.11 | 1.77 | 2.22 | 0.94 | 1.90 |

59.     The crediting rates earned by the peer plans' stable value products came with total protection of principal, and without exposing the Plan to additional risk compared to the GIBC.[8] Thus, the differences in rates are not attributable to the products offered by peer plans taking on additional risk; instead, they are the result of the scale, cost, and sophistication used to develop and deliver the product.

60.     Superior products with higher crediting rates consistent with the peer averages were available to the Plan, had Defendants made a diligent effort to monitor and investigate the Plan's opportunities in the marketplace. The Plan was eligible to exit its GIBC product at book value, and Defendants failed to take advantage of the Plan's opportunities.

61.     Defendants could have selected an off-the-shelf product with a proven track record of competitive rates, such as the TIAA RC Plus, which was available to the Plan during the relevant time and included in multiple peer plans.[9] Defendants also could have moved the Plan to a custom contract negotiated with Principal or another provider. For example, Norton

---

[7] For purposes of the standard deviation analysis, the "average" is the simple average, not the asset-weighted average.
[8] For example, TIAA has consistently maintained the same or superior credit rating compared to Principal, which means that TIAA is deemed to expose investors to less risk of default on its guarantees.
[9] TIAA has offered the RC Plus product since 2006.

Healthcare (Kentucky) was invested in an off-the-shelf Principal stable value product before negotiating a custom product with Principal in 2019, which increased its plan's stable earnings by more than 65% relative to the off-the-shelf product.

PLAN LOSSES EXCEED $11.4 MILLION

62.     The cost of the Committee's failure to implement a prudent process to evaluate its stable value fund, understand the relevant market, and test the market—and of Sentara's failure to monitor the Committee—is over $11.4 million since the beginning of 2019 through year's end 2023. This measure of loss is the difference between the Plan's compound stable value earnings from the GIBC and the stable value earnings the Plan would have generated had Defendants acted prudently and offered a competitive stable value product with crediting rates at least as high as TIAA's RC Plus between the start of 2019 and year-end 2023.

63.     The Plan's losses have continued, and will continue, to accrue and to compound from and after year-2023, until and unless Defendants remove and replace the GIBC.

64.     The Plan's losses due to Defendants' imprudence passed through to the individual accounts of all Plan participants invested in the GIBC.

**PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' FIDUCIARY BREACHES**

65.     Plaintiffs did not have knowledge of all material facts necessary to state a claim (including, among other things, the crediting rates paid by comparable stable value products available to the Plan) until shortly before suit was filed.

66.     Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making and monitoring processes with respect to the Plan because this information is solely within the possession of Defendants pending discovery. For purposes of this Complaint,

Plaintiffs have drawn reasonable inferences regarding these processes based upon, among other things, the investigation of counsel and the facts set forth above.

## CLASS ACTION ALLEGATIONS

67.     29 U.S.C. § 1132(a)(2) authorizes a participant or beneficiary of the Plan to bring an action on behalf of the Plan to seek the remedies provided by 29 U.S.C. § 1109(a). In addition, 29 U.S.C. § 1132(a)(3) authorizes a participant or beneficiary to bring suit for injunctive or other equitable relief. Plaintiffs seek certification of this action as a class action pursuant to these statutory provisions and Fed. R. Civ. P. 23.

68.     Plaintiffs assert their claims against Defendants on behalf of a class of participants and beneficiaries of the Plan defined as follows:

> All Plan participants with a balance in the GIBC at any time since the date that is six years prior to the date that this action was filed, along with their beneficiaries and alternate payees of record, excluding Committee members and any directors and officers of Sentara with fiduciary responsibility for the Plan's investments.

69.     **Numerosity:** The Class is so numerous that joinder of all Class members is impracticable. The Plan has thousands of participants.

70.     **Typicality:** Plaintiffs' claims are typical of the Class members' claims. Plaintiffs participated in the Plan and were exposed to the same below-market returns on stable value assets as other Class members. Defendants managed the Plan uniformly and treated Plaintiffs consistently with other Class members. Defendants' imprudent actions and omissions affected all Class members similarly.

71.     **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do

not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

72. **Commonality:** Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

    A.    Whether Defendants are fiduciaries of the Plan, and the scope of their fiduciary duties;

    B.    Whether Defendants breached their fiduciary duties under 29 U.S.C. §1104 by engaging in the acts and omissions described herein;

    C.    Whether Defendants' fiduciary breaches caused losses to the Plan;

    D.    The proper form of equitable and injunctive relief; and

    E.    The proper measure of monetary relief.

73. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

74. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, will be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as replacement of investments or service providers or removal of Plan fiduciaries, will be dispositive of non-party participants' interests. The restoration of assets of the

Plan required under 29 U.S.C. §§ 1109 and 1132 will be similarly dispositive of the interests of other Plan participants.

75.     Class certification also is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' performance of their fiduciary duties. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I

## Violation of 29 U.S.C. § 1104(a)(1) by the Committee

76.     Plaintiffs adopt by reference the foregoing factual allegations.

77.     The Committee breached its fiduciary duties in connection with its monitoring and retention of the Plan's stable value investment option.

78.     The Committee's fiduciary duties included managing the Plan's assets for the sole and exclusive benefit of Plan participants and beneficiaries and acting with the care, skill, diligence, and prudence required by ERISA.

79.     The Committee is responsible for monitoring the Plan's investments on an ongoing basis and removing and replacing imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently. In order to do so, the Committee had to have a viable, documented process and methodology for monitoring the Plan's investment and expenses.

80.     As the Supreme Court confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

81.     The Committee failed to implement a prudent process for selecting, retaining, or monitoring the Plan's stable value investment option. The Plan has had the same stable value option for 25 years, and its earnings are far short of what the Plan can obtain in the marketplace at the same level of risk. This breach would be rectified if the Committee put the Plan's stable value contract out for bid, but the Committee has not done so.

82.     The Committee is liable under 29 U.S.C. § 1109(a) to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty and is subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the information presently available, which is incomplete.

83.     The Plan, Plaintiffs, and members of the putative class suffered losses or are reasonably likely to suffer future losses resulting from the foregoing fiduciary breaches of the Committee.

## COUNT II

### Violations of 29 U.S.C. §§ 1104(a)(1) and 1105(a)(2) by Sentara

84.     Plaintiffs adopt by reference the foregoing factual allegations.

85.     Sentara is the ultimate governance authority with respect to the Plan, including the appointment of members of the Committee. Accordingly, Sentara is a fiduciary with respect to the Plan and has a duty of prudence to monitor the Committee appropriately. *See* 29 C.F.R. § 2509.75-8, D-4; *Leigh v. Engle*, 727 F.2d 113, 135 (7th Cir. 1984).

86.     Sentara has a duty to monitor the Committee to ensure that it is engaging in appropriate fiduciary processes. The lack of any competitive process or marketplace review by the Committee concerning the Plan's stable value contract, $136 million as of 2023, was a red flag to Sentara that the Committee was not fulfilling its fiduciary duties. By failing to intervene, Sentara enabled the Committee to continue to violate its fiduciary duties, and breached Sentara's own independent fiduciary duties to the Plan and Plan participants.

87.     Sentara is liable under 29 U.S.C. § 1109(a) to make good to the Plan all losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the information available to Plan participants to date.

88.     The Plan, Plaintiffs, and members of the putative class suffered losses or are reasonably likely to suffer future losses resulting from the foregoing fiduciary breaches of Sentara.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, as representatives of the Class defined herein, and on behalf of

the Plan, pray for relief as follows:

A.   A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.   A declaration that Defendants have breached their fiduciary duties under ERISA;

D.   An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to its position but for this unlawful conduct;

E.   An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties, and replacing Committee members;

F.   Other equitable relief to redress Defendants' practices and to enforce the provisions of ERISA as may be appropriate;

G.   An award of pre-judgment interest;

H.   An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

I.   An award of such other and further relief as the Court deems equitable and just.

Respectfully submitted,

Dated: January 8, 2025

**CASEY JONES LAW FIRM**

s/Nicholas D. Thompson
Nicholas D. Thompson, VA Bar No. 92821
323 N. Washington Avenue, Suite 200
Minneapolis, MN 55401
Telephone: (612) 305-8349
Facsimile: (612) 677-3050
nthompson@caseyjones.law

**ENGSTROM LEE LLC**

Jennifer K. Lee, MN Bar No. 399012*
Carl F. Engstrom, MN Bar No. 396298*
323 N. Washington Avenue, Suite 200
Minneapolis, MN 55401
Telephone: (612) 305-8349
Facsimile: (612) 677-3050
jlee@engstromlee.com
cengstrom@engstromlee.com

**THE JAMES WHITE FIRM LLC**

James H. White IV, AL Bar No. 3611I58J*
2100 Morris Avenue
Birmingham, AL 35203
Telephone: (205) 317-2551
james@whitefirmllc.com

*Pro Hac Vice* motion forthcoming

**ATTORNEYS FOR PLAINTIFFS**