## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

|  |  |
|---|---|
| TRACEY CARTER, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>SENTARA HEALTHCARE<br>FIDUCIARY COMMITTEE, *et al.*,<br><br>    Defendants. | Case No. 2:25-cv-16 |

### OPINION & ORDER

Defendants Sentara Healthcare Fiduciary Committee and Sentara Health (collectively "Sentara") seek summary judgment on claims that they breached their fiduciary duties to employees by imprudently managing a stable value option in their defined contribution retirement plan. ECF Nos. 40 (motion), 41 (memorandum). Sentara also moves for the exclusion of certain opinions and testimony of the plaintiffs' proffered experts on liability and losses, Matthew Eickman and Christian Toft. ECF Nos. 37 (motion), 38 (memorandum).

For the reasons stated herein, the motion for summary judgment will be **DENIED**, and the motion to partially exclude the testimony of Eickman and Toft will be **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

The following facts are undisputed:[1]

1.    Defendant Sentara Health sponsors the Sentara Health 403(b) Savings Plan (the "Plan"), a defined contribution retirement plan governed under the Employee Retirement Income Security Act (ERISA). ECF No. 35 at 6 ¶ 19; ECF No. 41 at 6 ¶¶ 1, 3; ECF No. 54 at 8 ¶ 3.

2.    One of the Plan's investment offerings is the Guaranteed Interest Balance Contract ("GIBC"), a stable value option unique to retirement plans. ECF No. 35 at 2–3 ¶¶ 6–7; ECF No. 41 at 7 ¶ 4; ECF No. 54 at 8 ¶ 4, 12 ¶ 18.

3.    Plaintiffs Tracey Carter and Bonny Davis are Plan participants who invested in the GIBC during the relevant period.[2] ECF No. 35 at 6–7 ¶¶ 24–25; ECF No. 41 at 7 ¶ 5; ECF No. 54 at 8 ¶ 5.

4.    Defendant Sentara Healthcare Fiduciary Committee (the "Committee"), a named fiduciary, oversees the Plan's investment offerings, including the GIBC. ECF No. 35 at 6 ¶ 23, 7 ¶ 26; ECF No. 41 at 7–8 ¶ 8; ECF No. 54 at 7–8 ¶ 2, 9 ¶ 8.

5.    The Committee retained Aon, an outside investment consultant and co-fiduciary that provides the Committee with annual fiduciary training and quarterly reviews measuring the performance of the Plan's investments—including the GIBC—

---

[1] The Court includes only the facts required for its decisions on the motions addressed in this Opinion and Order.

[2] Carter is currently invested in the GIBC, but Davis is not. ECF No. 41 at 7 ¶ 5; ECF No. 54 at 8 ¶ 5.

against market benchmarks and peer groups recommended by Aon's in-house research team.[3] ECF No. 41 at 8 ¶¶ 9, 14; *id.* at 10 ¶ 20; ECF No. 54 at 9–10 ¶¶ 7, 9.

6.    The Committee, advised by Aon, adopted and maintains an Investment Policy Statement ("IPS")[4] that outlines its goals and procedures for monitoring investments, and a new strategic plan is developed ahead of each year that guides performance monitoring and discussions at the Committee's quarterly meetings.[5] ECF No. 41 at 8 ¶¶ 10–12; ECF No. 54 at 10 ¶¶ 10–12.

7.    The Committee receives ongoing fiduciary advice from outside ERISA counsel. ECF No. 41 at 8 ¶ 9; ECF No. 54 at 9–10 ¶ 9.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment will be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[3] Sentara contends that the Committee received information from Aon quarterly regarding the performance of the GIBC against "peer groups and the benchmark listed in the Investment Policy Statement." ECF No. 41 at 10 ¶ 20. But the plaintiffs dispute that the GIBC's performance was measured against multiple peer groups and a single benchmark. ECF No. 54 at 13 ¶ 20. Instead, the plaintiffs assert that there were two different securities index benchmarks for the GIBC throughout the relevant period: pre-2020, 50% U.S. 90-Day Treasury Bills and 50% Barclays Intermediate Aggregate Index; and from 2020 to present, 100% U.S. 90-Day Treasury Bills. *Id.* And the plaintiffs contend that there was a single peer group utilized: the Hueler Universe. *Id.*

[4] As relevant here, the parties agree that the IPS was updated in 2016, 2020, 2021, and 2024. ECF No. 41 at 8 ¶ 10; ECF No. 54 at 10 ¶ 10.

[5] The parties dispute whether the Committee reviewed the performance of "all" Plan investments at the quarterly meetings. ECF No. 54 at 10 ¶ 11, 11–12 ¶ 15. The

Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A fact is material if it might affect the outcome of the suit under the governing law, and a genuine dispute exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Robinette*, 105 F.4th 99, 113 (4th Cir. 2024) (quotation marks and citation omitted).

The moving party bears the initial burden to establish that no genuine issue of material fact remains. *Med. Mut. Ins. Co. of N. Carolina v. Gnik*, 93 F.4th 192, 200 (4th Cir. 2024) (citation omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To do that, the movant must support their assertions as to undisputed facts by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

If the moving party is successful in the first instance, then the burden "shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial." *Gnik*, 93 F.4th at 200 (citation and quotation marks omitted); *see Celotex*, 477 U.S. at 324. "The facts and all justifiable inferences arising therefrom must be viewed in the light most favorable to the non-movant." *Gnik*, 93 F.4th at 200 (citation omitted). However, if the non-movant "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or may

---

contents and implications of the annual strategic plan are also disputed. *Id.* at 10–12 ¶¶ 14, 15.

"grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it." Fed. R. Civ. P. 56(e). In deciding a motion for summary judgment, the court is not required to consider any materials in the record outside of what the parties include with their briefing. Fed. R. Civ. P. 56(c)(3).

**B.    Motions to Exclude Expert Testimony**

A qualified expert witness "may testify in the form of an opinion or otherwise if . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The expert's testimony must be "based on sufficient facts or data" and must be "the product of reliable principles and methods." Fed. R. Evid. 702(b), (c). And the expert's opinion must "reflect[] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(d). The proponent of expert testimony bears the burden to demonstrate admissibility by a preponderance of the evidence. *See* Fed. R. Evid. 702; *Radiance Found., Inc. v. Nat'l Ass'n for the Advancement of Colored People*, 27 F. Supp. 3d 671, 673 (E.D. Va. 2013).

A district court considering the admissibility of expert testimony acts as a gatekeeper in assessing whether the proffered testimony is both reliable and relevant.[6] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *see also*

---

[6] The Fourth Circuit has recognized that "the district court's evidentiary gatekeeping function [is] relaxed" in a bench trial, where the district court is "in the best position to decide the proper weight to give the expert opinions." *United States v. Wood*, 741 F.3d 417, 425 (4th Cir. 2013) (citing *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.") (other citation omitted)).

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49 (1999) (holding that *Daubert's* gatekeeping obligation applies to all experts). An experiential witness must "explain how his experience leads to the conclusion reached, why his experience is a sufficient basis for the opinion, and how his experience is reliably applied to the facts." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007) (quoting Fed. R. Evid. 702 advisory committee note) (alterations accepted). "[T]he test of reliability is flexible[,] and the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* (cleaned up). The reliability inquiry focuses on the "principles and methodology employed by the expert, not on the conclusions reached." *United States v. Moreland*, 437 F.3d 424, 433 (4th Cir. 2006) (citation and quotations marks omitted).

## C.    Fiduciary Requirements Under ERISA

ERISA's duty of prudence requires fiduciaries to administer retirement plans "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) (quoting 29 U.S.C. § 1104(a)(1)(B)). Accordingly, fiduciaries have a "continuing duty to monitor" an investment to ensure it remains appropriate in light of the plan's objectives and the participants' best interests. *Stegemann v. Gannett Co.*, 970 F.3d 465, 474–75 (4th Cir. 2020); *Tatum*, 761 F.3d at 358. And "[i]f the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes*

*v. Nw. Univ.*, 595 U.S. 170, 176 (2022). ERISA also requires fiduciaries to act "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D).

In assessing whether a fiduciary has breached its duty of prudence, the "focus is on whether the fiduciary engaged in a reasoned [] process." *Tatum*, 761 F.3d at 356. Actions that suggest a prudent process include "appointing an independent fiduciary, seeking outside legal and financial expertise, holding meetings to ensure fiduciary oversight . . ., and continuing to monitor and receive regular updates on the investment's performance." *Id.* at 358. Determining whether a breach of fiduciary duty has occurred is a case-specific inquiry that "depend[s] on the character and aim of the particular plan and decision at issue and the circumstances prevailing at the time." *Id.* "At times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on [their] experience and expertise." *Hughes*, 595 U.S. at 177. Accordingly, a defendant seeking summary judgment must demonstrate that there is no genuine dispute as to the reasonableness of its conduct.

## III.    ANALYSIS

### A.    Sentara's Motion for Summary Judgment

Sentara contends that it is entitled to summary judgment because the Committee employed a prudent monitoring process as a matter of law, and the plaintiffs' proffered liability expert, Matthew Eickman, fails to raise any genuine question about the Committee's reliance on a benchmark or peer group to monitor

7

the performance of the GIBC—or the GIBC's performance against those metrics—because he is unqualified to offer such opinions. As a genuine issue of material fact remains regarding whether the GIBC was prudently monitored, and the plaintiffs proffer admissible expert testimony to substantiate their claims, Sentara is not entitled to judgment as a matter of law.

### i. *Prudent Monitoring Process*

Sentara argues that it is entitled to judgment as a matter of law because the undisputed facts show the Committee followed a documented monitoring process that closely resembles processes other courts have upheld as prudent, and the Committee retained the GIBC based on that process. ECF No. 41 at 12–16. Specifically, the Committee:

- retained the services of Aon, a "recognized expert" in the field of investment consultants, which provided the Committee with quarterly reports containing quantitative and qualitative assessments of the Plan's investments, including the GIBC, *id.* at 14;

- adopted successive versions of an IPS in 2016, 2020, 2021, and 2024 to memorialize its fiduciary process and serve as a guide in selecting and monitoring investment options—including by listing a performance benchmark and peer group for each type of investment, *id.* at 13–14;

- adopted benchmarks and peer groups for investments based on Aon's recommendations, *id.* at 14;

- in collaboration with Aon, created a strategic plan for each year outlining goals and discussion topics for quarterly meetings, *id.* at 8 ¶ 12; and

- met quarterly to review investment performance and fees, "took action where warranted," and decided to

make no changes to other aspects of the Plan based on "thorough discussion" and "materials provided,"[7] *id.* at 15.

The fact that Sentara enlisted the services of an investment consultant, adopted the consultant's recommendations (with respect to IPSs, annual strategic plans, and benchmarks and peer groups), and held quarterly meetings suggests that Sentara engaged in a *generally* prudent process.[8] *See Tatum*, 761 F.3d at 358. The plaintiffs' liability expert agrees with Sentara on this point. During deposition, Eickman explained that his "overall view" was that the Committee "did a pretty nice job of fulfilling most of its responsibilities . . . ." ECF No. 58-3 at 5:10–6:7. But it does not follow that Sentara's monitoring and retention of the GIBC was prudent as a matter of law.[9] Indeed, Eickman opined that "the fact that the Committee had done

---

[7] The plaintiffs dispute that the Committee reviewed "all" investments in the Plan and note that the Committee's meeting minutes do not reflect *any* discussion of the GIBC from 2019 to present. ECF No. 54 at 10 ¶ 11. The plaintiffs also dispute whether the Committee's "inaction or its reason for inaction . . . [is] consistent with the industry standard of care or a prudent process." *Id.* at 12 ¶ 16.

[8] *But see DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 421 (4th Cir. 2007) (although engaging an independent advisor provides "evidence of a thorough investigation," it is not a "whitewash" which, without more, satisfies ERISA's prudence requirement) (citations and quotation marks omitted); *see also Tibble v. Edison Int'l*, 711 F.3d 1061, 1082 (9th Cir. 2013) ("Courts are in broad accord that engaging consultants, even well-qualified and impartial ones, will not alone satisfy the duty of prudence.") (citing *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 799–800 (7th Cir. 2011)) (collecting cases from the Second, Fifth, Seventh, and Ninth Circuits).

[9] Sentara appears to confuse producing evidence that refutes the grounds on which the Court denied the motion to dismiss (i.e., showing that the Committee has *some* process) with putting to rest any genuine dispute about whether its process was prudent. ECF No. 41 at 5 ("This Court recently denied [the d]efendants' motion to dismiss based on [] allegations that the Committee had *no* process for monitoring the GIBC . . . [but] nothing could be further from the truth."). At the motion to dismiss

such a nice job with all of the other aspects of the 403(b) plan . . . sho[ne] [] a bright light on the absence of a detailed review[,] . . . ongoing monitoring, and any sort of competitive analysis" with respect to the GIBC. *Id.* at 6:7–14; *see also* ECF 41-31 ¶¶ 14(a)–(d). In other words, what is at issue in this case is not whether the Committee employed a generally prudent process with respect to *the Plan*, but whether the Committee prudently monitored *the GIBC*. On this question, the parties fundamentally disagree.

Although Sentara says a lot about the Committee's "overall approach" to monitoring the Plan's investments, ECF No. 58 at 1, the undisputed facts convey little about its monitoring of the GIBC, ECF No. 41 at 9–10 ¶¶ 18–21. And in response to the plaintiffs' argument that the defendants "do not even claim to have *reviewed* the quarterly [investment performance] reports in monitoring the GIBC," ECF No. 54 at 20, Sentara only points to deposition testimony that materials were generally shared with Committee members a week or two in advance of quarterly meetings, ECF No. 58-1 at 6:19–21, ECF No. 58-2 at 9:5–14; a deposed Committee member "reviews those materials typically," ECF No. 58-1 at 6:22–24; and "performance information on each of the investment options [was] presented" at quarterly meetings "based on

---

stage, the plaintiffs' claims survived because their allegation that the defendants had no process to evaluate whether the GIBC was a reasonable investment decision sufficed to state a plausible claim to relief. ECF No. 34 at 1–2, 8. But at the summary judgment stage, Sentara must demonstrate the absence of a genuine dispute of material fact—specifically, that its monitoring and retention of the GIBC was prudent as a matter of law. Sentara does not carry that burden.

. . . performance benchmarks and peer groups," ECF No. 58-2 at 74:7–12. ECF No. 58 at 8–10.

The evidence Sentara presents has little to no bearing on the plaintiffs' contention that, given the distinct nature of stable value options and the Plan's substantial stable investment assets, reasonably prudent monitoring of the GIBC required the defendants to "evaluat[e] the terms and conditions of the stable value contract, research[] the relevant market, and test[] the market by, among other things, issuing requests for information and proposals" from competing stable value providers. ECF No. 35 ¶ 7. That evidence also fails to dispel the plaintiffs' allegations that the Committee instead (1) exclusively relied on a benchmark and peer group that fundamentally differed from the GIBC and were thus "ill-suited for meaningful evaluation,"[10] ECF No. 54 at 24–25; (2) never conducted an annual stable market review for the GIBC, contrary to the requirements outlined in the Committee's strategic plan—despite doing so for the 401(k) and 401(a) plan stable value products, *id.* at 25–27; and (3) "never once explicitly discussed or evaluated the GIBC or otherwise took any efforts to determine whether superior alternatives were available in the marketplace," *id.* at 6.[11]

---

[10] The plaintiffs also argue that "looking at performance" is not a prudent process for a stable value fund whose performance is known and set in advance. ECF No. 54 at 11–12 ¶ 15.

[11] Although Sentara bears the initial burden to dispel these arguments with evidence, the Court notes that admissible evidence—the opinions and deposition testimony of Matthew Eickman—supports the plaintiffs' arguments, as explained below, *supra* Part III.A.ii.

On this record, the Court cannot find, as a matter of law, that the defendants prudently monitored the GIBC, because genuine disputes remain regarding what a reasonably prudent monitoring process looks like for a stable value investment option like the GIBC and whether the conduct of the defendants satisfies that standard.[12] And even if the monitoring process outlined by the defendants' investment objectives and strategic plan were adequate, there is also a genuine dispute as to whether the defendants prudently followed that process for the GIBC.[13] So the Court must deny

---

[12] Sentara admits that reasonableness is a circumstance-dependent inquiry and that courts do not use a uniform checklist to determine prudence; yet Sentara simultaneously argues that its methods were prudent as a matter of law because the Committee "engaged in exactly the kind of process that courts have repeatedly found prudent: hire a financial advisor, get regular updates on investment performance, and meet regularly to discuss." ECF No. 41 at 5, 12. But what is reasonably prudent under ERISA is a highly fact-intensive inquiry—so much so that multiple district courts have stated the determination is rarely appropriate on a motion for summary judgment. *See, e.g., Mills v. Molina Healthcare, Inc.*, 694 F. Supp. 3d 1272, 1285 (C.D. Cal. 2023) ("The prudence inquiry [for an ERISA plan fiduciary] is fact intensive [and] because it involves the application of a reasonableness standard, rarely will such a determination be appropriate on a motion for summary judgment.") (citation and quotation marks omitted); *Hunt v. Magnell*, 758 F. Supp. 1292, 1297 n.6 (D. Minn. 1991) (same); *Sherrill v. Fed.-Mogul Corp. Ret. Programs Comm.*, 413 F. Supp. 2d 842, 867–68 (E.D. Mich. 2006) (collecting cases concluding that it is error to decide the question of prudence as a matter of law).

[13] Sentara is not aided by the Fourth Circuit caselaw they claim "confirms" they followed a prudent process. ECF No. 41 at 15–16. In two of those cases, the record showed the defendant fiduciary exercised prudence by taking actions involving the specific fund at issue—not just the overall plan. *See DiFelice*, 497 F.3d at 416–17, 421 (defendant fiduciary sought advice from general counsel and outside legal counsel regarding whether to retain the fund, and the full board reviewed and voted to approve the committee's decision to retain the fund); *Reetz v. Aon Hewitt Investment Consulting, Inc.*, 74 F.4th 171, 184 (4th Cir. 2023) (defendant fiduciary "ke[pt] apprised of alternate investments in the market," "compared the [fund] to those alternatives[,]" and "ma[d]e underlying tweaks to the [fund]"). And the third case, *Tatum v. RJR Pension Inv. Committee*, makes clear that the duty of prudence requires fiduciaries to "*appropriately investigate* the merits of an investment decision"—a matter that is contested in this case. 761 F.3d at 358.

Sentara's motion for summary judgment if the plaintiffs can produce admissible evidence to support their claim. Fed. R. Civ. P. 56(c)(1). Given the testimony the plaintiffs proffer from Matthew Eickman, the Court concludes they have done so here.

### ii.    Matthew Eickman (Sentara's Daubert Motion)

In support of their assertion that the defendants breached their fiduciary duty by failing to prudently monitor the GIBC, the plaintiffs offer Matthew Eickman as their liability expert. Sentara argues that Eickman's opinions fail to raise a triable issue of fact because he is unqualified to opine on appropriate benchmarks and peer groups for investments like the GIBC. ECF No. 41 at 23–27.

---

The district court cases Sentara cites do not bind this Court; nor are they persuasive, as they are either procedurally or factually distinct from the instant case. *See Cho v. Prudential Ins. Co. of Am.*, No. 2:19-cv-19886, 2024 WL 5165459, *4 (D.N.J. Dec. 19, 2024) (investment committee members were "active participants in [quarterly] meetings, probing the information provided to them"); *In re Quest Diagnostics Inc. ERISA Litig.*, No. 2:20-cv-7936, 2024 WL 4285163, at *7 (D.N.J. Sept. 25, 2024) ("The undisputed record evidence show[ed] the [investment committee] administered [r]equests for [p]roposals . . . [and] took follow-up measures regarding both [challenged funds]."); *Nunez v. B. Braun Med., Inc.*, No. 5:20-cv-4195, 2023 WL 5339620, *1 (E.D. Pa. Aug. 18, 2023) (entering judgment for defendant fiduciary after weighing the evidence presented at trial).

To be clear, the Court is not suggesting that the defendants needed to implement the best monitoring process, to consider alternatives to the process they chose, or to make the most ideal investment decisions. Prudence under ERISA does not require perfection—only objective reasonableness. *See Reetz*, 74 F. 4th at 182 ("The duty of prudence . . . is [] context-specific" and "does not demand a fiduciary . . . make the optimal investment."); *DiFelice*, 398 F.Supp.2d at 467 (ERISA "does not require prescience of fiduciaries"). But here, a genuine dispute remains as to whether the method Sentara chose for monitoring the GIBC was reasonable in light of all the evidence.

Sentara's arguments regarding Eickman are essentially the same in the motion for summary judgment and the *Daubert* motion. Sentara first argues that Eickman is not qualified to offer an opinion on the selection of appropriate benchmarks and peer groups because he has "no direct experience" with analyzing investment products and selecting benchmarks or peer groups for investments like the GIBC. ECF No. 38 at 13–14. Sentara focuses on isolated deposition statements that Eickman did not have "primary responsibility for analyzing [stable value] products" and "[his] firm relied upon and partnered with an external provider" for the analysis and selection of peer groups and benchmarks. *Id.* at 14 (quoting Eickman's deposition, ECF No. 38-9 at 29:9–11, 33:15–34:1, 35:8–15). But the Court must "liberally judge[]" Eickman's qualifications, *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993), and neither Fed. R. Civ. P. 702 nor *Daubert* require a perfect fit between an expert's experience and the opinions proffered, *Benedict v. Hankook Tire Co., Ltd.*, 290 F.Supp.3d 488, 497 (E.D. Va. 2018). *See also, e.g., Belk Inc. v. Meyer Corp.*, 679 F.3d 146, 162 (4th Cir. 2012) (the requirement that an expert has specialized knowledge should not be read too narrowly).

Through his report and deposition testimony, Eickman explains his experience and how his opinions flow from that experience. Eickman worked as a retirement plan investment advisor at an Aon-analogous firm for 12 years—from June 2012 through June 2024—providing investment advice, IPS development and maintenance, committee governance and procedural oversight, and fiduciary training and education to defined contribution clients. ECF No. 41-31 ¶ 3; ECF No. 52-3 at

14

77:15–80:4, 100:2–10. In that role, Eickman was required to "review stable value options . . . and provide fiduciary advice" regarding the selection, monitoring, and retention of those options; he did so for approximately 20 to 25 clients and around five or six 403(b) plans. ECF No. 41-31 ¶ 4; ECF 52-3 at 75:9–20. Eickman's firm was "ultimately responsible" for coming up with benchmarks [or peer group comparisons] for clients' investments, although the firm partnered with an outside provider "to ensure that those benchmarks were both available and capable of being applied on a consistent basis for reporting purposes." ECF No. 52-3 at 101:6–15.

Eickman also frequently performed due diligence regarding potential changes to a plan's stable value fund. ECF No. 41-31 ¶ 5. For instance, he ran "a competitive process" that entailed evaluating the marketplace to ensure that a particular stable value product was examined "closely from a fiduciary perspective." ECF No. 52-3 at 90:18–92:2. These experiences inform Eickman's understanding of "industry standards for ERISA fiduciaries' monitoring of stable value funds" and provide a sufficient basis for him to opine regarding whether the defendants' monitoring of the GIBC fell below the industry standard of care. ECF No. 41-31 ¶ 4. If the defendants wish to challenge whether Eickman's level of experience undermines the credibility of his opinions, they are free to cross-examine him on this issue at trial. *See Benedict*, 290 F. Supp.3d at 497 ("An imperfect fit between the expert's knowledge and experience and the issues before the court impacts the weight given to the expert's testimony, not its admissibility.") (citation omitted).

Sentara next argues that Eickman's failure to identify what a more prudent benchmark or peer group would have been means that his opinion will not assist the factfinder in evaluating the defendants' prudence. ECF No. 38 at 14–15. However, Eickman *did* identify what a prudent benchmarking process would look like for a 403(b) stable value fund like the GIBC, and, to the extent Sentara disagrees with Eickman's methodology, that concern goes to the weight of his testimony, not its admissibility.

In essence, Eickman asserts that given the unique characteristics of stable value products like the GIBC, prudent monitoring requires a "due diligence process that differs from the process of monitoring a plan's other investment options." ECF No. 41-31 ¶ 27. As part of that monitoring process, Eickman opines that a fiduciary must utilize "an appropriate benchmark and peer group universe that matches the type of stable value product being used." *Id.* ¶ 38. But "the typical benchmarking process that compares the performance of a stable value option to a broad market index or peer group" is not sufficient for a stable value product, *id.* ¶ 39, because "there's not one . . . commonly accepted, publicly available index . . . for apples-to-apples comparison," ECF No. 52-3 at 92:3–12. Therefore, a fiduciary must "survey the alternatives available in the marketplace by other means." ECF No. 41-31 ¶ 39. Specifically, a prudent process requires "a true peer group" approach—measuring a stable value investment by assessing "how [the investment] performs relative to other

options that could have been selected."[14] ECF No. 52-3 at 92:7–17, 105:10–14, 127:13–15. And for plans "with substantial investments in stable value" like the Plan, surveying the marketplace requires periodically conducting request for information ("RFI") or request for proposal ("RFP") processes. ECF No. 41-31 ¶¶ 14(g), 31–32, 41.

Contrary to Sentara's argument that Eickman was unable to identify an appropriate benchmark or peer group, Eickman clearly testified that the Committee should have "asked Aon to build [] a custom peer group that allows for comparison to other general account products that would've been available in the marketplace, 204 or 3(b) plan." ECF No. 38-9 at 44:6–12. Only when asked for a non-custom peer group recommendation did Eickman state that he did not "know that [he] ha[d] a specific recommendation *there*"—which makes sense since Eickman opines that the typical route used to benchmark other types of investments is not sufficient for monitoring the performance of a stable value product. *Id.* at 45:3–9 (emphasis added). Nevertheless, he stated that if one were to go the non-custom peer group route, they would need to find a way to do so that "recognize[s] the type of plan [being evaluated,] a 403(b) plan. . . . [And] therefore, there would be some that [he] would not apply."[15] *Id.* at 45:9–13.

---

[14] Eickman testified that his "firm's perspective was that the way to benchmark" for 403(b) clients with general account stable value products was "to fold [benchmarking and peer-group comparison] in together and to look at [a] peer group" comprised of "other available options within the marketplace." ECF No. 52-3 at 103:17–104:11.

[15] Sentara also contends Eickman testified that an appropriate peer group might be "something by Morningstar"—the peer group presently utilized by the Committee (given Morningstar's acquisition of Hueler). ECF No. 38 at 10. But the words "something by Morningstar" do not appear in the provided transcript materials, and Eickman did not recommend Morningstar as an appropriate benchmark for the

Additionally, Eickman opines that the Committee's failure to prudently monitor the GIBC extends beyond the use of inapt benchmarks and peer groups. He explains that although "Committee meeting materials frequently included [s]trategic [p]lans reflecting the express intention to review the plans' stable value options[,]" "the Plan's advisor presented information reflecting the recommendation that the Committee perform quarterly monitoring of the plans' stable value options[,]" and "Sentara['s] 403(b) Plan's advisor . . . recommend[ed] that the Committee perform a 'Capital Preservation Investment Review' on an annual basis[,]" the Committee singularly focused on monitoring Sentara's 401(a) and 401(k) stable value options while giving "no consideration" to the 403(b) Plan's stable value option (the GIBC). ECF No. 41-31 ¶¶ 58–60, 67, 75 (emphasis removed). And Eickman opines that the Committee's failure to conduct *any* meaningful review of the GIBC persisted despite several "warning signs" that should have triggered additional scrutiny. *Id.* ¶¶ 68–71, 73, 88. Instead, the Committee relied solely upon benchmarks that "did not effectively serve the core function . . . to provide objective means of measuring the performance" of the GIBC,[16] *id.* ¶¶ 76–78, and a peer group that "created an apples-to-oranges framework for comparison," *id.* ¶¶ 79–82.

---

GIBC, either. And in any event, immediately after stating there would be some non-custom peer groups that he would *not* utilize to measure a 302(b) plan's stable value fund, Eickman stated, "I referenced earlier the utilization of [] the Morningstar CIT peer group . . . and *that would not be an appropriate one.*" ECF No. 38-9 at 45:13–17 (emphasis added).

[16] Sentara asserts that the case law indicates "[n]othing in ERISA suggests [the p]laintiffs can gin up a breach of the duty of prudence by trying to impose 'more aggressive benchmarks' on the Committee[,]" citing *Pizarro v. Home Depot, Inc.*, 111 F.4th 1165, 1181 (11th Cir. 2024). ECF No. 41 at 26–27. But in *Pizarro*, the district

Sentara argues that Eickman's inability to identify an appropriate benchmark or peer group via the custom route reveals his lack of expertise in this area.[17] *See* ECF No. 38 at 14–15; ECF No. 41 at 24–25. But while an expert's testimony must be based on "good grounds" and constitute "more than subjective belief or unsupported speculation," neither Fed. R. Evid. 702 nor *Daubert* requires an expert to use the method opposing counsel would select. *Daubert*, 509 U.S. at 589–90; *see Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) ("Reliability is a 'flexible' inquiry that focuses on 'the principles and methodology' employed by the expert.") (quoting *Daubert*, 509 U.S. at 594–95); *BorgWarner, Inc. v. Honeywell Int'l, Inc.*, 750 F. Supp. 2d 596, 615 (W.D.N.C. 2010) (collecting cases). A review of Eickman's report

---

court found a genuine dispute of material fact as to whether the defendant fiduciary failed to prudently monitor the funds at issue, including a stable value option. *Id.* at 1170. Nevertheless, the court granted summary judgment because the plaintiffs failed to sustain their burden to show "that a hypothetical prudent fiduciary, armed with the information a proper evaluation would have yielded," would have made a different investment decision. *Id.* at 1171. And the plaintiffs' argument there that the fund was objectively imprudent relied only on changing the index against which the fund was benchmarked. That is not the case here, where the plaintiffs assert the Committee failed to conduct *any* meaningful review of the GIBC, which they contend must extend beyond traditional benchmarking, and should also include periodic investment reviews. Additionally, Sentara does not argue that the plaintiffs fail to show a genuine dispute of material fact on loss causation.

[17] In support of this claim, the defendants cite *Iannone v. AutoZone, Inc.*, 344 F.R.D. 319, 338–39 (W.D. Tenn. 2023), in which the district court excluded a proffered expert's opinion on the proper benchmarking of crediting rates for general accounts due to a lack of specialized knowledge on the subject. ECF No. 41 at 26. But there, the expert admitted that, while the Hueler Universe is an appropriate benchmark for measuring the performance of synthetic products, he could not "speak on the fact of . . . what you use for [a] general account." *Iannone*, 344 F.R.D. at 338–39 (alterations accepted). In contrast, Eickman is able to form an opinion as to the proper way to measure the performance of a stable value product—it just does not align with the methodology Sentara's rebuttal expert used.

and the report of Sentara's rebuttal expert indicates that the plaintiffs have met their burden to demonstrate the reliability of Eickman's methods by a preponderance of the evidence.[18] Fed. R. Evid. 702. If the defendants wish to challenge the credibility of Eickman's assertion that prudence requires measuring performance against a custom peer group, they may do so on cross-examination. *United States v. A & S Council Oil Co.*, 947 F.2d 1128, 1135 (4th Cir. 1991) ("Full examination of the underpinnings of an expert's opinion is permitted because the expert, like all witnesses, puts his credibility in issue by taking the stand."); *see Gunning v. Cooley*, 281 U.S. 90, 94 (1930) ("Issues that depend on the credibility of witnesses[] and the effect or weight of evidence[] are to be decided by the [factfinder].").

Because Sentara's objections to Eickman's testimony go to weight, not admissibility, the Court will deny Sentara's *Daubert* motion. For the same reasons, the plaintiffs survive summary judgment with respect to the breach element of their claims.[19]

---

[18] Although the Court finds that Eickman's opinions and testimony are legally sufficient to be admissible under *Daubert*, this ruling does not address the weight the Court will assign to Eickman's testimony at trial. In other words, the Court is not finding that Eickman's opinions and testimony are sufficient to satisfy the plaintiffs' burden of demonstrating that the defendants violated their duty of prudence as to the GIBC.

[19] Sentara argues that, because its monitoring process was prudent, Toft's loss calculations and Eickman's proposals about additional actions that the Committee could have taken are irrelevant. ECF No. 41 at 27–28. The Court will not engage on this argument because the record does not support a finding that the Committee's monitoring of the GIBC was prudent as a matter of law. Likewise, Sentara's argument that the GIBC "performed as expected" is irrelevant given the material dispute as to whether the GIBC's performance was measured prudently. *Id.* at 6, 17–20, 23, 26–27; ECF No. 38 at 7.

### B.    Sentara's Remaining *Daubert* Motions

Sentara additionally moves to exclude Eickman's entire rebuttal report and a portion of Christian Toft's reply report. The Court will deny Sentara's motion as to Eickman's rebuttal report and grant the motion as to Toft's reply.

### i.    *Eickman's Rebuttal Report*

Sentara contends that the opinions expressed in Eickman's rebuttal report are unreliable because the report "egregiously mischaracterizes" the opinions of Sentara's rebuttal witness. ECF No. 38 at 11, 16–17; *see* ECF 38-11 ¶ 2. Specifically, Sentara argues that because its expert, Philip Suess, did not directly state any of the purportedly agreed-upon assertions and there is no way to reasonably infer that Suess held any of those beliefs, Eickman's entire rebuttal report is unreliable. ECF No. 38 at 16–17.

Sentara may cross-examine Eickman to challenge whether his report accurately conveys Suess's opinions—but this is not an appropriate basis for a *Daubert* motion since the factual basis for Eickman's opinion ultimately goes to the credibility of his testimony. *See Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 195 (4th Cir. 2017) ("To determine whether an opinion of an expert witness satisfies *Daubert* scrutiny, courts may not evaluate the expert witness'[s] conclusion itself," and "questions regarding the factual underpinnings of the expert witness'[s] opinion affect the weight and credibility of the witness'[s] assessment, not its admissibility.") (quotation marks omitted and alterations accepted).

Accordingly, Sentara's motion to exclude Eickman's rebuttal report will be denied.

### ii.    Toft's Reply Report

The plaintiffs proffer Christian Toft as their expert on losses. Sentara moves to exclude paragraphs one through nine of Toft's reply report, arguing that Toft is not qualified to render opinions on proper benchmarks and peer groups for measuring the performance of the GIBC because (1) Toft admits that he has no experience, knowledge, skill, education, or training in advising ERISA plan sponsors on such matters, and (2) Toft based his opinions about benchmarking on Eickman's opinions rather than on his own analysis. ECF No. 38 at 17. Because Toft is not qualified to render opinions on the use of the 90-Day Treasury Bill and the Hueler Index to measure the performance of the GIBC, Sentara's motion will be granted.

Toft's expert report compares the performance of the GIBC to the performance of competing products in the marketplace and surveys stable value investments in other 403(b) plans to quantify the loss the plaintiffs suffered based on Sentara's purportedly imprudent monitoring and retention of the GIBC. ECF No. 38-12 ¶¶ 2–5. Toft states that he "ha[s] not been asked to opine as to the [fiduciary] standard of care for selecting, monitoring, removing, or replacing stable value products," which is the subject of Eickman's opinion.[20] *Id.* ¶ 5. In contrast, paragraphs one through six

---

[20] Toft additionally testified that his "engagement was limited and focused on calculating the loss associated with not having replaced the GIBC" and that he did not do "any analysis of the fiduciary process that the Sentara Committee undertook." ECF No. 41-35 at 8:23–9:11.

of Toft's reply report analyze the use of the 90-Day U.S. Treasury to benchmark the performance of the GIBC, and paragraphs seven through nine analyze the use of the Hueler Index to monitor the GIBC's performance. ECF No. 38–13 ¶¶ 1–9. Ultimately, Toft concludes that the "characteristics of the 90-Day T-Bill index make it a poor benchmark" and "too low a bar" for the GIBC, *id.* ¶¶ 1, 6, and "insurance company general account products . . . in 403(b) plans[] provide[] much better information" than the Hueler peer group, *id.* ¶ 8.

Based on the evidence before the Court, Toft is qualified only to analyze the GIBC against comparator stable value funds. Toft has a degree in quantitative economics, and his relevant work experience includes sourcing and managing a portfolio of guaranteed investment contracts (GICs) like the GIBC on behalf of municipalities—including by participating in near-daily competitive bids for GICs—and participating in the implementation of a GIC-backed note program. ECF No. 38-12 ¶¶ 6–7; ECF No. 41-35 12:10–13:4. But Toft has never performed work related to pension plan investments. ECF No. 41-35 at 26:13–27:4, 47:9–14. More importantly, Toft has no knowledge or experience regarding the selection of suitable benchmarks or peer groups for a stable value fund. *Id.* at 10:10–19 (stating he is only "generally familiar" with the "idea of benchmarking"); *id.* at 82:18–21 (acknowledging he has no experience "with how pension fund investment committees utilize benchmarks in their efforts to monitor investment performance").

Additionally, Toft lacks expertise related to the specific benchmark and peer group Sentara uses to monitor the GIBC's performance. He admits he has no

understanding of whether it is "common for stable value funds . . . to benchmark against a 90-day treasury." ECF No. 41-35 at 82:22–83:2. And with respect to his "understanding of what the Hueler Peer Group is," Toft admitted, "I only know what [] Eickman said about it. I didn't look at it. . . . I didn't really look at the Hueler index in any detail." *Id.* at 84:19–85:2.

Toft may not merely parrot Eickman's opinions regarding the Hueler Universe without independent knowledge or expertise to support such assertions. Although Fed. R. Evid. 703 permits an expert to testify to an opinion based on facts or data gathered by another expert, an expert may not simply adopt opinions formed by another expert outside his field of expertise. *See, e.g., In re TMI Litig.*, 193 F.3d 613, 716 (3d Cir. 1999) (an expert may not show an "unblinking reliance" on another expert's opinions but must instead evaluate the validity of those opinions); *Mooring Capital Fund, LLC v. Knight*, 388 F. App'x 814, 820 (10th Cir. 2010) ("An expert is not entitled to testify to opinions that rely on the opinion of another expert, simply because the other is an expert."); *Dura Auto. Sys. of Indiana, Inc. v. CTA Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) (an expert, "however well credentialed [they] may be, is not permitted to be the mouthpiece" of an expert in an entirely different area of study in which they lack expertise). Accordingly, Toft's experience does not provide a sufficient basis for him to offer an opinion on the use of the 90-Day Treasury and the Hueler Index to monitor the GIBC's performance.

The plaintiffs argue that Sentara fails to explain why Toft's opinions should be excluded based merely on a lack of experience advising ERISA plan sponsors in

identifying appropriate benchmarks and peer groups. ECF No. 51 at 15. But the defendants' concerns are not so narrowly drawn. Based on his expert report, curriculum vitae, and deposition testimony, Toft has no relevant experience *whatsoever* in identifying appropriate benchmarks and peer groups. And Toft's general familiarity with the concept of benchmarking does not render him an expert on the matter—something his "extensive experience working with GICs" does not change. *Id.* at 16. Therefore, Toft's testimony will be limited to quantification of loss based upon comparing the performance of the GIBC to the performance of competing products in the marketplace.

## IV.    CONCLUSION

Sentara's motion for summary judgment (ECF No. 40) is **DENIED**. Sentara's motion to exclude certain testimony and opinions of plaintiffs' experts (ECF No. 37) is **DENIED** as to Matthew Eickman and **GRANTED** as to Christian Toft.

The parties are **ORDERED** to contact the chambers of the Honorable Douglas E. Miller, at 757-222-7228, on or before February 4, 2026, to schedule a settlement conference. Additionally, the parties are **DIRECTED** to meet and confer and propose a trial schedule to the Court on or before February 18, 2026.

**IT IS SO ORDERED**.

_____ /s/ _____
Jamar K. Walker
United States District Judge

Norfolk, Virginia
January 30, 2026

25